**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| JOSEPH PARISI,<br><br>        Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES;<br><br>UNITED STATES FOOD AND DRUG ADMINISTRATION<br><br>        Defendant. | Case No.:_____<br><br><br><br>**JURY TRIAL DEMAND** |

**COMPLAINT FOR DAMAGES**

**AND DECLARATORY AND INJUNCTIVE RELIEF**

COMES NOW Plaintiff Joseph Parisi, by and through undersigned counsel, and for his Complaint against Defendants Abbott Laboratories, and the United States Food and Drug Administration states and alleges as follows:

**INTRODUCTION**

This is a product liability and administrative law action involving injuries sustained by Plaintiff following the implantation and failure of a spinal cord stimulator (SCS) system designed, manufactured, and marketed by Defendant Abbott Laboratories. The device was implanted in Plaintiff's body as a purported treatment for chronic pain, but it failed to perform as promised and instead caused serious harm.

1

The SCS device at issue received FDA approval in 2001 under PMA P010032, originally granted to Advanced Neuromodulation Systems, later acquired by St. Jude Medical, then Abbott Laboratories. Since that time, however, the device has been fundamentally altered through dozens of PMA supplements, modifying its battery chemistry, firmware, waveform control, leads, and user interface, without the benefit of a new PMA or any renewed clinical safety validation.

These cumulative changes, approved outside public view, transformed the device's mechanism of action, performance characteristics, and risk profile. Abbott failed to disclose these material changes to patients, physicians, or regulators. As a result, Plaintiff was implanted with a device that was materially different from what had been tested and originally approved. he suffered painful neurologic symptoms and worsening pain symptoms that required revision surgery and left him permanently injured.

Plaintiff brings this action under South Carolina and/or Illinois law, and the Administrative Procedure Act, asserting both traditional product liability and statutory claims. He seeks compensatory damages for his injuries and equitable relief requiring the FDA to fulfill its statutory duties and restore integrity to the PMA process.

## PARTIES

### I.     Plaintiff

1.     Plaintiff Jospeh Parisi is a resident and citizen of the State of South Caroline. At the time this Complaint is filed, Plaintiff resides in Little River, Horry County, South Carolina. The devices at issue were implanted in Plaintiff in Myrtle Beach, South Carolina. Plaintiff has received medical treatment related to the device, including revision and removal of the device, in Myrtle Beach, South Carolina.

### II.     Defendants

2.     Defendant Abbott Laboratories is a corporation organized under the laws of the State of Illinois with its principal place of business located in Abbott Park, Lake County, Illinois. Abbott Laboratories is a global healthcare corporation engaged in the design, manufacture, promotion, and sale

of medical devices, including spinal cord stimulation systems, throughout the United States, including in South Carolina. Abbott Laboratories assumed ownership of the SCS device portfolio at issue following its acquisition of St. Jude Medical in 2017.

3.     Defendant the United States Food and Drug Administration is an agency of the United States government within the Department of Health and Human Services responsible for regulating medical devices under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., and its implementing regulations. The FDA is named solely in its official capacity for purposes of claims brought under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701-70.

## JURISDICTION AND VENUE

4.     *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states – specifically, Plaintiff is domiciled in South Carolina, whereas Defendant is an Illinois corporation with its principal place of business located in Illinois

5.     This Court also has federal question jurisdiction over Plaintiff's claims brought under the Administrative Procedure Act, 5 U.S.C. § 701 et seq., pursuant to 28 U.S.C. § 1331, as those claims arise under the laws of the United States.

6.     *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant Abbott Laboratories because it conducts substantial business within this District, and has purposefully availed itself of the privileges of conducting activities within the State of South Carolina. The causes of action alleged herein arise from Defendant's forum-based conduct.

7.     *Venue.* Venue is proper in the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here, including injuries to Plaintiff.

**FACTUAL ALLEGATIONS**

### III.    APPLICABLE LAW AND CHOICE OF LAW

8.    This action arises under both federal and state law. Plaintiff brings federal claims against the United States Food and Drug Administration ("FDA") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and state-law claims against Abbott Laboratories for personal injuries sustained as a result of its defective spinal cord stimulator system, which was designed, regulated, and marketed from within this District.

9.    Plaintiff was implanted with the subject device in the State of South Carolina, currently resides in South Carolina, and experienced the injuries giving rise to this lawsuit in South Carolina. Accordingly, Plaintiff's tort claims are governed by South Carolina law.

10.    However, significant aspects of the design, manufacture, regulatory strategy, and labeling of the device occurred within the State of Illinois. Defendant Abbott Laboratories is headquartered in Lake County, Illinois, and its spinal cord stimulator operations, including FDA submissions, marketing approvals, and product development, were directed from that location at all relevant times.

11.    Under Illinois choice of law principles, courts apply the "most significant relationship" test as set forth in the Restatement (Second) of Conflict of Laws, considering factors such as the place of injury, the place of conduct, the domicile of the parties, and the location where the relationship is centered. *See Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 903 (Ill. 2007).

12.    South Carolina law governs Plaintiff's personal injury claims. To the extent this action concerns Abbott's regulatory decisions, FDA submissions, and corporate conduct occurring in Illinois, Plaintiff invokes Illinois law in the alternative for claims that arise from Defendant's forum-based behavior.

4

**IV.     REGULATORY BACKGROUND AND PMA HISTORY**

13.     The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., requires that all Class III medical devices undergo pre-market approval ("PMA") by the United States Food and Drug Administration ("FDA") before they may be introduced into interstate commerce. The PMA process is the most rigorous pathway under the FDCA and is intended to ensure the safety and effectiveness of devices that support or sustain human life, prevent impairment of human health, or present a potential unreasonable risk of illness or injury.

14.     Once a PMA is approved, 21 C.F.R. § 814.39(a) prohibits any change to the design, materials, energy source, software, manufacturing process, or labeling of the device that could significantly affect its safety or effectiveness without submission of a new PMA or a panel-track PMA supplement. The manufacturer bears the burden of demonstrating continued safety and effectiveness for all significant changes. Manufacturers may not use the PMA supplement process as a backdoor to avoid new clinical testing or public review.

15.     The spinal cord stimulator (SCS) system implanted in Plaintiff was marketed under PMA P010032, originally approved in 2001 for a basic neurostimulator system manufactured by Advanced Neuromodulation Systems, Inc. This predicate device consisted of an implantable pulse generator (IPG), fixed stimulation output parameters, a wired programming system, and a battery designed for limited-term use. This predicate system was called the Genesis Neurostimulation (IPG) System.

16.     Since that time, Abbott and its predecessors submitted more than 230 PMA supplements, fundamentally transforming the device's internal firmware, waveform architecture, patient interface, battery design, wireless communication, and safety-critical stimulation parameters. Despite these cumulative changes, no new PMA has ever been required or submitted.

5

17. Upon information and belief, the following PMA supplements illustrate material modifications that independently or cumulatively significantly altered the device's safety and effectiveness:

| Supplement # | Decision Date | Supplement Type | Device/Model | Description / Relevance |
|---|---|---|---|---|
| S025 | 01/29/2009 | Real-Time Process | Genesis RC & Eon | Design/components/specification change |
| S028 | 03/19/2009 | 180-Day Track | Eon Mini | Manufacturer/location change |
| S058 | 09/14/2012 | Real-Time Process | Eon Mini | Design/components/specification change |
| S066 | 03/15/2013 | Real-Time Process | Eon Mini | Design/components/specification change |
| S068 | 05/17/2013 | Real-Time Process | Eon Mini 2.0 | Design/components/specification change |
| S073 | 04/25/2014 | 180-Day Track | Eon Mini | Manufacturer/location change |
| S086 | 11/13/2014 | 30-day notice | Eon Mini / Protégé / Protégé MRI | Platform/device family expansion |
| BurstDR Approval | 10/2016 | Approval | Prodigy / Proclaim Elite | BurstDR therapy approval (new stimulation pattern) |
| S125 | 07/21/2017 | 180-Day Track | Proclaim IPG Family | Platform evolution, new device family approval |
| S151 | 09/09/2019 | Real-Time Process | Proclaim SCS Family | Labeling change (indications, trade name) |
| Proclaim XR Launch | 09/26/2019 | Press Release | Proclaim XR | Recharge-free, low-dose BurstDR launch |
| S167 | 08/18/2020 | Real-Time Process | SCS IPG | Design/components/specification change |
| S187 | 08/19/2022 | Real-Time Process | Proclaim SCS | Design/components/specification change |
| S189 | 01/24/2023 | Panel Track | Prodigy / Proclaim / Proclaim XR | Indication expansion (e.g., DPN) |

| S213 | 06/26/2024 | 180-Day Track | SCS IPG Family | Design/components/specification change |
|---|---|---|---|---|

18.     These changes cumulatively altered the device's mode of action, safety controls, stimulation effects, battery stability, and susceptibility to failure. Abbott did not conduct new clinical trials to validate these design changes and failed to disclose material risks to physicians and patients, including Plaintiff.

19.     On September 11, 2023, the FDA classified five separate Class I recalls of Abbott's Proclaim-series SCS devices, including the Proclaim DRG IPG, XR 5/7 IPGs, and Plus 5/7 IPGs. These recalls were issued in response to complaints from patients experiencing painful electric shocks, sudden device shutdowns, and failure to deliver therapeutic stimulation. These hazards arose from the very firmware, waveform, and interface changes introduced by the above listed supplements.

20.     On May 16, 2024, Abbott initiated a recall of the Proclaim 5 Elite SCS pulse generator due to a product labeling defect. This hazard arose from changes made through the PMA supplementation process.

21.     These recalls illustrate that the cumulative effect of Abbott's modifications significantly impacted device performance and patient safety. Had these changes been submitted for a new PMA, as required by 21 C.F.R. § 814.39(a), the public, medical community, and FDA advisory panels would have had the opportunity to evaluate the altered risk-benefit profile before widespread market use.

22.     Instead, Abbott was permitted to bypass that obligation. As a result, Plaintiff received multiple devices that were fundamentally different from the system described in the original PMA, with

undisclosed risks and unvalidated functionality that ultimately failed and caused him significant injury and lasting harm.

23.    That decision, coupled with the FDA's tolerance of nearly 250 design-altering PMA supplements over the next 20 years, allowed Abbott to retain the litigation shield of PMA preemption while evading the corresponding regulatory burdens. This conduct exemplifies a dual-track deception: one track for approval, another for modification and marketing. This pattern of agency leniency is precisely the type of unchecked administrative discretion that the Supreme Court curtailed in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

## V.    <u>REGULATORY FRAMEWORK AND FEDERAL DUTIES</u>

24.    The FDA regulates Class III medical devices under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq. Class III devices, including spinal cord stimulators, pose the highest risk to patient safety and are subject to the most stringent regulatory controls, including premarket approval ("PMA") and post-market surveillance.

25.    Manufacturers of PMA devices may not make changes that affect safety or effectiveness without prior approval of a new PMA or a panel-track supplement. See 21 C.F.R. § 814.39(a). This regulation imposes a nondiscretionary duty: material changes, whether in firmware, battery chemistry, stimulation parameters, user interfaces, or surgical instrumentation, require full review and public validation.

26.    PMA approval also imposes ongoing federal duties, including:
- Postmarket adverse event reporting under 21 C.F.R. Part 803;
- Compliance with design controls (21 C.F.R. § 820.30);
- Manufacturing process validation (21 C.F.R. § 820.75);
- Complaint investigations and corrections under the CAPA rule (21 C.F.R. § 820.100);
- Truthful and non-misleading labeling, updated through 21 C.F.R. § 814.39(d).

8

27. The spinal cord stimulator implanted in Plaintiff's body was not approved based on independent clinical trial data, but rather on a finding by the FDA that the device was "sufficiently similar" to other SCS systems reported in the literature. See Summary of Safety and Effectiveness Data, P010032B, § 1.11. This "sufficient similarity" standard is less rigorous than the "substantial equivalence" requirement for 510(k) Class II clearance. Yet, it served as the evidentiary basis for granting Abbott's devices the powerful preemption protections afforded by PMA status.

28. In 2001, Advanced Neuromodulation Systems (ANS), the original sponsor of this device, submitted a petition asking the FDA to reclassify its SCS system from Class III to Class II. An expert advisory panel reviewed the data and agreed that reclassification was appropriate. The FDA overruled its own panel and denied the petition. Thereafter, the FDA approved the device as a Class III product, based not on new human clinical evidence, but on its alleged similarity to prior-generation devices.

29. That decision, coupled with the FDA's tolerance of nearly 250 design-altering PMA supplements over the next 20 years, allowed Abbott to retain the litigation shield of PMA preemption while evading the corresponding regulatory burdens. This conduct exemplifies a dual-track deception: one track for approval, another for modification and marketing.

30. If spinal cord stimulator manufacturers wish to benefit from PMA preemption, they must also bear the burden of compliance. Courts should not allow them to weaponize preemption as both sword and shield while quietly discarding the regulatory obligations that rationalize and support that protection.

31. The FDA has a statutory duty to prevent this erosion of Class III protections. By permitting Abbott to transform its device architecture without public clinical review, the agency has undermined the integrity of the PMA process.

## VI.     ALLEGATIONS REGARDING THE FDA AND THE ADMINISTRATIVE PROCEDURE ACT

32.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, authorizes judicial review of final agency actions where an agency acts arbitrarily, capriciously, or contrary to law, or unlawfully withholds nondiscretionary action.

33.     Under 5 U.S.C. § 706(1), a court may compel agency action unlawfully withheld. Under 5 U.S.C. § 706(2)(A), it may set aside agency actions that are arbitrary, capricious, or in excess of statutory authority.

34.     The FDA's decision to approve PMA P010032B was based on a regulatory shortcut. In its Summary of Safety and Effectiveness, the FDA explicitly stated that the device had not been clinically tested in the relevant patient population but was "sufficiently similar" to prior devices. The device was therefore approved on a lower evidentiary basis than required for

510(k) clearance, yet afforded full preemption under *Riegel v. Medtronic*.

35.     The FDA's refusal to require a new PMA despite significant changes to the device violates 21 C.F.R. § 814.39(a). Abbott's cumulative modifications, comprising firmware upgrades, battery redesigns, Bluetooth-based interfaces, and waveform expansions, render the current device materially different from that approved in 2001.

36.     None of these changes were subject to panel-track review or public advisory panel input. The FDA approved them through real-time or 180-day supplement pathways without updated clinical safety data.

37.     The FDA's passive endorsement of these changes, including its allowance of Abbott's continued marketing under an outdated PMA, constitutes a final agency action subject to judicial review. It also constitutes unlawful withholding of action required by law.

38.     These regulatory failures were not inadvertent. They reflect the agency's longstanding practice of allowing iterative Class III device changes without substantive oversight, a practice that courts are no longer required to defer to following the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

39.     Plaintiff seeks declaratory and injunctive relief under the APA. This includes a judgment that the FDA has violated nondiscretionary statutory and regulatory duties, and an injunction requiring the agency to review the Abbott SCS system through a new PMA, or to take enforcement action consistent with 21 U.S.C. § 360e and 21 C.F.R. § 814.39(a).

40.     Plaintiff does not seek to second-guess FDA policy. Rather, he seeks to enforce the letter of the law. Abbott cannot continue to market a materially altered device under the guise of a 2001 approval that was never supported by clinical trial data in the first place.

41.     The FDA must fulfill its statutory duties and restore integrity to the PMA process.

## VII.     PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

42.     Plaintiff Joseph Parisi is a resident and citizen of the State of South Carolina. At the time this Complaint is filed, Plaintiff resided in Little River, Horry County, South Carolina. The device at issue was implanted in Plaintiff in Myrtle Beach, South Carolina. Plaintiff has received medical treatment related to the device, including removal of the device, in Myrtle Beach, South Carolina.

43.     On or about June 9, 2021 Plaintiff was surgically implanted with an Abbott Proclaim spinal cord stimulator system for the treatment of chronic pain.

44.     Prior to the implant of the SCS system, Plaintiff was implanted with a temporary, external trial SCS system for a short period of time.

45.     Prior to the implant of the device, Plaintiff talked with an Abbott sales representative about the SCS system. The sales representative advised Plaintiff that the permanent device would provide

Plaintiff with long term pain relief, was safe and backed by clinical validation, would be functionally equivalent to the trial SCS system, and would alleviate Plaintiff's need to receive other treatment for his chronic pain.

46.    Based on the representations made by this sales representative, before, during and after the SCS trial period, Plaintiff elected to be permanently implanted with the SCS system.

47.    The implanted system included components from St. Jude's Eon platform, developed and marketed under PMA P010032 and its numerous supplements. The Eon system incorporated functions and features not present in the predicate device originally approved in 2001.

48.    Rather than experiencing pain relief, Plaintiff has, instead, experienced incontinence, shocking, and numbness of his extremities.

49.    Plaintiff underwent surgical intervention on August 2, 2023 to remove the SCS system due to mechanical and therapeutic failure of the device. Plaintiff continues to suffer from pain and symptoms caused and exacerbated by the malfunctioning system

50.    All leads used in the SCS systems implanted in Plaintiff were manufactured and sold by Abbott or its predecessors.

51.    As a direct and proximate result of the defective and misrepresented nature of the device, Plaintiff suffered physical injury, worsening pain, emotional distress, and economic damages including medical expenses and loss of quality of life.

52.    Plaintiff discovered the probable causal relationship between his injuries and Defendant's conduct only after experiencing continued device-related complications and reviewing public disclosures, adverse event reports, and litigation materials that contradicted Defendant's original representations.

## VIII. ADDITIONAL FACTUAL ALLEGATIONS SUPPORTING LIABILITY

53.     At all times relevant to this Complaint, Abbott Laboratories or its predecessors were responsible for the design, manufacture, testing, labeling, promotion, sale, post-market surveillance, and regulatory compliance of the spinal cord stimulator (SCS) system implanted in Plaintiff.

54.     The devices marketed to Plaintiff and his healthcare providers as the Eon, Protégé MRI, and Proclaim XR 5 SCS systems bore little resemblance to the device originally approved under PMA P010032. These devices incorporated multiple significant changes to their hardware, firmware, user interface, waveform architecture, battery system, and wireless programming, each of which materially impacted the devices' safety, performance, and failure modes.

55.     Despite these changes, Abbott never submitted a new PMA. Instead, the company submitted nearly 250 piecemeal supplements—many of which were processed under expedited review programs, including 30-day notices and real-time reviews—avoiding panel-track scrutiny and clinical revalidation.

56.     Abbott failed to disclose that the devices implanted in Plaintiff's body had never been tested through a full PMA-level clinical trial in human patients. The original approval of PMA P010032 was based not on manufacturer-sponsored trials, but on FDA conclusions that the Genesis system was "sufficiently similar" to other devices discussed in the literature. This flawed evidentiary standard was accepted by the FDA only after it overruled its own expert advisory panel, which had recommended reclassifying SCS devices from Class III to Class II.

57.     Abbott relied on the full preemption shield of PMA status to market its device as safe and effective, while knowingly and repeatedly altering the system beyond what was originally validated. It failed to notify physicians or patients that the implanted device:

- Used firmware-dependent control systems absent from the predicate;
- Allowed smartphone-based patient programming via Bluetooth;

- Delivered burst and high-frequency stimulation patterns not subject to human testing under the PMA;
- Was affected by lead migration, communication delays, and unpredictable charging performance, as documented in MAUDE reports and adverse event summaries.

58. As previously alleged, between 2020 and 2023, Abbott initiated multiple recalls involving the Proclaim system. On September 11, 2023, the FDA classified five recalls of Abbott's Proclaim XR and Proclaim DRG IPGs as Class I—its most serious category, reserved for devices that may cause serious injury or death.

59. These recalls were issued in response to patient complaints of:
- Painful electrical shocks;
- Sudden unintended stimulation;
- Loss of therapy;
- Device failure during recharging;
- Malfunctioning wireless communication and programming failures.

60. These malfunctions were directly linked to design and firmware changes made in PMA supplements between 2017 and 2022, including supplements S036 (Bluetooth programming), S043 (Proclaim XR rebranding), and subsequent firmware updates approved in S051–S062. Abbott knew or should have known that these cumulative changes significantly altered the device's safety and effectiveness.

61. On May 16, 2024, Abbott initiated a recall of the Proclaim 5 Elite SCS pulse generator due to a product labeling defect, arising from product labeling changes it had made to the device in Supplement S151. The product labeling of the Proclaim Elite SCS system was never subjected to PMA review and scrutiny.

62. Abbott failed to update product labeling, device manuals, or promotional materials to reflect the true performance characteristics of the altered device. Nor did it warn physicians or patients of

14

the risks of stimulation failure, lead migration, charging errors, nerve damage, and device failure—despite mounting adverse event reports and internal design change documentation.

63. Abbott also failed to maintain adequate design validation and risk analysis documentation as required under 21 C.F.R. § 820.30(g), and failed to investigate and address post-market complaints as required by 21 C.F.R. § 820.198 and § 820.100.

64. These violations of FDA-mandated Current Good Manufacturing Practices (cGMPs) were not isolated or inadvertent. They reflect a systemic disregard for regulatory obligations, a practice of iterative design without public revalidation, and a prioritization of market expansion over patient safety.

65. The defects in the Eon, Protégé MRI, and Proclaim systems, their design, firmware, labeling, and risk disclosure, were a direct and proximate cause of Plaintiff's injuries. These defects existed at the time the device left Abbott's control and were not known or reasonably knowable to Plaintiff or his physicians at the time of implantation.

66. At all relevant times, Plaintiff used the product as intended and in a foreseeable manner. The product failed to perform as represented, and the manifested risks were not disclosed in the device's labeling, Instructions for Use, or patient education materials.

67. Abbott's conduct was knowing, deliberate, and reckless. It knowingly placed a materially altered medical device into the stream of commerce, misrepresented its safety and approval status, and failed to correct known defects through regulatory pathways available under federal law.

68. Upon information and belief, the Proclaim Elite SCS system and related system components implanted in Plaintiff deviated from Abbott's FDA-approved manufacturing specifications for firmware execution stability, wireless programming reliability, and charging cycle consistency. These deviations resulted in stimulation shutoff, painful electric shocks, and therapy loss, all of which Plaintiff experienced and have been reported by other users of the same device model.

15

69. The malfunctions leading to recalls of the Proclaim system reflect systemic deficiencies in Abbott's manufacturing processes and a failure to conform to its Quality System Regulation (QSR) obligations under 21 C.F.R. §§ 820.30(g), 820.75, 820.198, and 820.100. Abbott failed to adequately validate or monitor these performance characteristics post-market, despite prior complaints and adverse event reports.

70. The devices implanted in Plaintiff were not reasonably safe at the time they left Abbott's and its predecessor's control, and their malfunction during regular use, which included loss of therapy and the need for surgical revision and removal, were a direct and foreseeable consequence of Abbott's failure to ensure adherence to its approved manufacturing controls.

Plaintiff's injuries were not caused by a known or disclosed risk; rather, they stemmed from a defect in the execution of the product's firmware and power management systems, which were neither tested nor monitored in accordance with binding federal regulations. Moreover, these injuries resulted from latent manufacturing deviations, particularly in firmware execution and power management, that were not reflected in labeling or Instructions for Use and were undetectable by implanting physicians.

## CAUSES OF ACTION

I. **COUNT I – STRICT PRODUCTS LIABILITY:   MANUFACTURING DEFECT (Against Abbott Laboratories)**

71. Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

72. At all times relevant to this action, Abbott Laboratories (hereafter reference to Abbott Laboratories shall include any applicable predecessor company, including St. Jude Medical) was engaged in the business of designing, manufacturing, testing, labeling, distributing, and selling medical devices, including the spinal cord stimulator systems implanted in Plaintiff.

16

73.     The devices implanted in Plaintiff were in essentially the same condition as when they left the hands of Abbott, and they were not reasonably safe for their intended use due to a manufacturing defect. The products, as manufactured and sold, deviated from Abbott's own FDA-approved specifications and did not conform to the design and performance standards described in PMA P010032 and its associated supplements.

74.     Specifically, as detailed in preceding allegations, the device in Plaintiff failed to conform with federal Quality System Regulations, including 21 C.F.R. §§ 820.30(g) (design validation), 820.75 (process validation), 820.100 (corrective and preventive action), and 820.198 (complaint handling). These violations resulted in systemic defects in firmware execution, wireless programming reliability, and battery charging performance.

75.     These deviations were not theoretical. Plaintiff's implanted device failed during normal and foreseeable use, producing painful sensations, stimulation loss, and other adverse effects that led to surgical removal and permanent injury.

76.     Plaintiff's injuries were not caused by a known or inherent risk of the device when properly manufactured, but rather by a departure from its intended and approved construction. The product failed to perform as represented, and it would not have failed but for Abbott's failure to comply with FDA-mandated specifications and manufacturing protocols.

77.     Under South Carolina and Illinois law, Abbott is strictly liable for injuries caused by a manufacturing defect that rendered the device unreasonably dangerous at the time it left its control.

78.     As a direct and proximate result of the manufacturing defect in the device, the Plaintiff suffered physical injury, pain, medical expenses, loss of enjoyment of life, and other damages.

17

**II.**    **COUNT II – STRICT PRODUCTS LIABILITY:  FAILURE TO WARN (Against Abbott Laboratories)**

79.    Plaintiff incorporates by reference allegations set forth above as though fully set forth herein.

80.    At all times relevant, Abbott Laboratories had a duty to provide adequate warnings and instructions regarding the known or reasonably foreseeable risks associated with its spinal cord stimulator system, including the Eon, Protégé MRI, and Proclaim XR systems.

81.    Under South Carolina law, a product is defective if it is unreasonably dangerous due to the absence of adequate warnings or instructions. This duty extends to risks known or knowable in light of the scientific, clinical, or regulatory knowledge available at the time the product was marketed and distributed.

82.    The spinal cord stimulator devices implanted in Plaintiff were in essentially the same condition as when they left the hands of Abbott, and they were materially altered from the system originally approved under PMA P010032. The systems he received included firmware-driven stimulation control, Bluetooth-enabled programming interfaces, and high-density waveform functionality that were never clinically validated in human trials or publicly disclosed at the time of approval.

83.    Abbott failed to update its Instructions for Use (IFU), patient education materials, and physician-facing labeling to disclose:

- The risk of painful stimulation spikes or loss of therapy during wireless charging;
- The instability of firmware updates and potential for loss of device communication;
- The increased rate of lead migration and therapy failure reported post market;
- The cumulative nature of the device's evolution, and that its current form bore little resemblance to the device described in PMA P010032 or its Summary of Safety and Effectiveness Data.

18

84.     The failure to warn was compounded by Abbott's internal knowledge of these risks, including MAUDE reports, post-market complaint data, and prior design and validation issues. Despite this knowledge, Abbott continued to represent the device as "safe and effective" and failed to initiate field safety notifications, device labeling changes, or provider education consistent with 21 C.F.R. § 814.39(d) or 21 C.F.R. § 820.198.

85.     Plaintiff and his healthcare providers reasonably relied on Abbott's representations and omissions in deciding to proceed with implantation of the SCS devices. Had they been adequately warned of the known risks, the device would not have been implanted, or alternative treatments would have been pursued.

86.     Plaintiff's injuries were caused in whole or in part by Abbott's failure to warn of known or knowable dangers associated with the use of its product. These failures rendered the device unreasonably dangerous for its intended use and constitute a defect under South Carolina and Illinois law.

87.     As a direct and proximate result of Abbott's failure to warn, Plaintiff suffered physical injury, pain, medical costs, surgical intervention, emotional distress, and other damages.

## III.     COUNT III – NEGLIGENCE PER SE: FEDERAL REGULATORY VIOLATIONS (Against Abbott Laboratories)

(21 C.F.R. §§ 803.50, 820.198, 814.39(a), 814.82(a); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531S. 341 (2001); *Hughes v. Boston Scientific Corp.*, 631 F.3d 762 (5th Cir. 2011))

88.     Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

89.     Under South Carolina and Illinois law, a person injured by the violation of a statute or regulation intended to protect the class of persons to which that person belongs may recover damages under a theory of **negligence per se**.

19

90.     Abbott Laboratories was subject to, and violated, multiple non-discretionary federal duties that were enacted for the protection of public health and safety. These duties are embodied in the Food, Drug, and Cosmetic Act (FDCA), the Medical Device Amendments of 1976, and FDA regulations promulgated thereunder, including:

- **21 C.F.R. § 814.39(a)** – requiring new PMAs for changes that may affect device safety or effectiveness;
- **21 C.F.R. § 803.50** – mandating adverse event reporting;
- **21 C.F.R. § 820.30(g)** – requiring design validation under expected use conditions;
- **21 C.F.R. § 820.75** – requiring process validation to ensure consistent device output;
- **21 C.F.R. § 820.198** – requiring investigation of complaints;
- **21 C.F.R. § 820.100** – mandating corrective and preventive action (CAPA) when product failures are identified;
- **21 C.F.R. § 814.39(d)** – requiring labeling updates in response to known risks.

91.     The device implanted in Plaintiff materially deviated from the system approved in PMA P010032. It incorporated design and firmware changes that altered its safety profile, yet Abbott failed to file a new PMA or submit panel-track supplements, as required by 21 C.F.R. § 814.39(a). Abbott instead submitted piecemeal supplements and exploited expedited review programs to bypass clinical safety validation.

92.     Abbott also failed to report adverse events linked to stimulation shutoff, therapy loss, and electrical shocks under 21 C.F.R. § 803.50. These adverse effects were known to Abbott prior to Plaintiff's implantation and were consistent with reports subsequently leading to Class I recalls in 2023.

93.     Abbott violated design and manufacturing regulations by failing to validate the performance of its firmware-dependent stimulation control, Bluetooth-based programming, and battery

recharging systems. It also failed to initiate CAPA processes in response to known problems, and did not investigate or disclose known product complaints in accordance with 21 C.F.R. §§ 820.100 and 820.198.

94.    Each of these violations constitutes a breach of federal laws that were designed to protect a class of persons, of which Plaintiff is a member, against a particular type of harm.

95.    Plaintiff is a member of the class of persons these statutes and regulations are intended to protect: patients receiving high-risk Class III medical implants under the FDA's PMA regulatory framework. Plaintiff's injuries are of the type these laws are intended to prevent—namely, harm resulting from undisclosed and unremedied device malfunctions that occur due to failures in quality systems, post-market reporting, and product validation.

96.    As a direct and proximate result of Abbott's violations of federal regulations and South Carolina law, Plaintiff suffered compensable physical injury, pain, medical costs, loss of enjoyment of life, and other damages.

97.    These regulatory violations were not merely technical infractions, but material breaches of duties specifically intended to prevent the type of harm suffered by Plaintiff— namely, therapy loss, neurological injury, and delayed surgical intervention due to systemic firmware and charging failures.

### IV.    <u>COUNT IV – BREACH OF EXPRESS WARRANTY (Against Abbott Laboratories)</u>

98.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

99.    Under South Carolina law, an express warranty is created when a seller makes an affirmation of fact or promise to the buyer that relates to the goods and becomes part of the basis of the bargain. S.C. Code Ann. § 36-2-313. Illinois laws are in accord.

100.    Prior to the implantation of the Eon, Protégé, and Proclaim spinal cord stimulator devices, Abbott Laboratories made explicit representations in its promotional materials, device labeling,

21

Instructions for Use (IFU), public statements, and directly to Plaintiff through its sales representatives that the device was safe, effective, reliable, and had been adequately tested for use in human patients suffering from chronic pain.

101. Abbott expressly warranted that its SCS devices provided consistent pain relief, seamless therapy delivery, safe wireless programming, and a rechargeable platform with superior reliability and patient comfort. Abbott's provider materials represented that its SCS systems were "FDA-approved," "clinically validated," and "designed for long-term use with low complication rates." These claims were repeated in sales brochures, website copy, and Abbott's physician training materials. These claims were repeated directly to Plaintiff through Abbott's sales representatives prior to each of his implant decisions.

102. These affirmations and promises became part of the basis of the bargain between Abbott and Plaintiff, as well as Plaintiff's implanting physician. Plaintiff and his physician relied on these representations to proceed with the implantation of the Proclaim Elite system.

103. In fact, the Proclaim Elite system implanted in Plaintiff had never undergone clinical validation in its final marketed form. The FDA approved the system based on "sufficient similarity" to earlier devices, not on Abbott-sponsored clinical trial data specific to the device actually implanted. Abbott failed to disclose that its device had been significantly altered through nearly 250 PMA supplements, nor that these changes materially affected the device's safety and reliability.

104. The device failed to perform as promised. Plaintiff experienced therapy loss, painful electrical sensations, device communication failure, and required surgical revision and removal. The product was not safe, effective, or reliable as expressly warranted by Abbott, and Abbott failed to provide adequate warnings or updates contradicting its original claims.

105.     Abbott's breach of its express warranties directly and proximately caused Plaintiff's injuries. Had the device performed as warranted, Plaintiff would not have suffered worsening pain, adverse neurological symptoms, or required surgical intervention.

106.     As a result of this breach of express warranty, Plaintiff is entitled to recover all compensatory damages allowed under Illinois law, including medical expenses, pain and suffering, and other economic and noneconomic losses.

### V.     COUNT V – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE (Against Abbott Laboratories)

(Under Applicable State Law)

107.     Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

108.     Under South Carolina law, a seller who is a merchant with respect to goods of that kind warrants that the goods shall be merchantable and fit for the ordinary purposes for which such goods are used.  Illinois laws are in accord.

109.     Abbott Laboratories is a merchant engaged in the business of manufacturing, marketing, and selling spinal cord stimulator systems, including systems implanted in Plaintiff. These devices are used for the ordinary purpose of treating chronic pain through safe and effective neuromodulation therapy.

110.     When Abbott marketed and sold its SCS systems implanted in Plaintiff, it implicitly warranted that the devices were of merchantable quality, conformed to FDA-approved specifications, and were reasonably safe for its intended medical purpose. Abbott also implicitly  warranted that the devices were fit for the specific purpose of long-term implantation to treat Plaintiff's condition, as recommended by his physician.

23

111. The devices implanted in Plaintiff were not of merchantable quality, nor were they fit for their intended purpose. They failed to operate as expected due to known defects in firmware execution, wireless programming, battery recharging, and therapy delivery. Plaintiff experienced painful shocks, therapy failure, and ultimately underwent surgical removal due to the product's unreliability and malfunction.

112. These failures were not caused by misuse or physician error. They were the direct result of design-altering changes Abbott implemented without corresponding clinical testing or validation, and without disclosing these risks in labeling or provider materials. The devices failed to conform to the minimum standards of merchantability and fitness for long-term neuromodulation therapy.

113. Abbott's breach of implied warranties was a proximate cause of Plaintiff's injuries, including physical pain, surgical intervention, economic loss, and emotional distress. Plaintiff would not have consented to the implantation had he or his physician known the device was unfit for its intended use.

## VI. COUNT VI – NEGLIGENCE (Against Abbott Laboratories)

(Under Applicable State Law)

114. Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

115. Abbott Laboratories owed Plaintiff a duty of reasonable care in the design, development, manufacture, labeling, testing, marketing, sale, and post-market surveillance of the spinal cord stimulator systems that it placed into the stream of commerce.

116. Abbott breached its duty of care in one or more of the following ways:

a. By negligently failing to ensure that the devices were manufactured in accordance with FDA-approved specifications, including labeling, firmware, battery safety, and programming reliability standards;

b. By negligently introducing cumulative design changes through successive PMA supplements without proper validation, public clinical testing, or physician disclosure;

c. By negligently failing to investigate known risks associated with stimulation loss, painful shocks, and therapy failure, despite premarket complaints, post-market adverse event reports, and internal device testing;

d. By negligently failing to update its Instructions for Use, provider communications, or promotional materials in accordance with 21 C.F.R. § 814.39(d) and 21 C.F.R. § 820.198, despite known malfunctions;

e. By negligently failing to report adverse events related to its Proclaim SCS systems in accordance with 21 C.F.R. Part 803;

f. By failing to initiate corrective and preventive actions under 21 C.F.R. § 820.100 after receiving adverse reports of stimulation instability, lead migration, or battery failure consistent with the experience of Plaintiff and other patients.

117. These negligent acts and omissions constitute breaches of both Abbott's duties under South Carolina and Illinois common law and its nondiscretionary regulatory obligations under the FDCA and FDA regulations, including 21 C.F.R. Part 803, 21 C.F.R. §§ 820.30(g), 820.75, 820.100, 820.198, and 814.39(a)–(d). These regulatory violations support a state-law claim for negligence and are not preempted under *Riegel v. Medtronic* or *Buckman v. Plaintiffs' Legal Committee*. Abbott's deviation from these standards was not isolated, but systemic, as evidenced by repeated internal and public reporting of identical failure modes across multiple product models.

118.    South Carolina law similarly imposes a duty on manufacturers to exercise ordinary care in the design, manufacture, labeling, and distribution of medical devices, including duties to investigate known hazards and warn of risks not adequately disclosed.  Illinois laws are in accord.

119.    Abbott's breach of its duties of care caused Plaintiff's injuries. As alleged above, Plaintiff suffered painful device malfunction and therapy failure resulting in surgical revision and eventual removal of the SCS system. These harms were foreseeable and preventable had Abbott exercised reasonable care.

120.    As a direct and proximate result of Abbott's negligence, Plaintiff suffered physical pain, emotional distress, financial harm, and other compensable damages under South Carolina law.

## VII.    COUNT VII – NEGLIGENT MISREPRESENTATION (Against Abbott Laboratories)

121.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

122.    At all times relevant, Abbott Laboratories, in the course of its business, made representations to healthcare providers, patients, and the general public regarding the safety, effectiveness, regulatory status, and performance of its spinal cord stimulator systems.

123.    Abbott represented, through promotional materials, Instructions for Use, patient education resources, and provider training, that its SCS devices:

- Were safe and effective for the long-term treatment of chronic pain;

- Were fully FDA-approved and compliant with all applicable regulations;

- Had been validated through rigorous clinical trials or otherwise demonstrated safe through FDA-approved testing;

- Maintained reliability in therapy delivery, stimulation programming, and battery recharging.

26

124. These representations were false. As set forth in the preceding allegations, Abbott failed to disclose that:

- Neither the Eon, Protégé, or Proclaim devices had never been clinically validated in its marketed form;

- These devices had undergone significant design and firmware changes through more than 230 PMA supplements;

- These changes materially altered its performance and introduced new, untested risks;

- Multiple recalls and adverse events had already emerged related to therapy shutoff, stimulation spikes, battery failure, and wireless programming.

125. Abbott made these misrepresentations and omissions in a commercial context, intending physicians and patients to rely on them in making decisions regarding device selection, implantation, and long-term management.

126. Abbott also made these misrepresentations directly to Plaintiff through its sales representatives, who misrepresented to Plaintiff that the permanent SCS systems would provide Plaintiff with long term pain relief, were safe and backed by clinical validation, would be functionally equivalent to the trial SCS system, and would alleviate Plaintiff's need to receive other treatment for his chronic pain.

127. Plaintiff's treating physician reasonably relied on Abbott's misrepresentations when selecting the Abbott system for implantation. Plaintiff, in turn, relied on the statements made by Abbott in patient-directed materials and directly to Plaintiff by Abbott and St. Jude Medical sales representatives, including assurance of FDA approval, therapy safety, and reliability, when consenting to implantation.

128. Abbott failed to exercise reasonable care in obtaining or communicating accurate information about the device's clinical validation, safety risks, and actual approval history. A reasonable

manufacturer in Abbott's position would have known, or should have known, that its cumulative modifications had introduced serious safety issues and altered the nature of the devices from its predicate.

129. As a direct and proximate result of Abbott's negligent misrepresentations and omissions, Plaintiff suffered foreseeable physical and economic harm, including the pain and cost of unnecessary and dangerous implantation and eventual revision surgery.

130. For avoidance of doubt, Plaintiff alleges misrepresentations were made to him and his healthcare providers, not the FDA.

## VIII.    COUNT VIII – FRAUDULENT CONCEALMENT (Against Abbott Laboratories)

131. Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

132. At all times relevant, Abbott Laboratories had superior knowledge of critical facts concerning the safety, efficacy, and approval history of its spinal cord stimulator systems— information not available to Plaintiff, his treating physician, or the general public.

133. Abbott was under a duty to disclose material facts relating to the performance and risks of the Eon, Protégé, and Proclaim system due to:

- Its exclusive access to adverse event reports and internal product complaint data;

- Its control over PMA supplement disclosures and labeling updates;

- Its direct and indirect representations to patients and physicians;

- Its statutory and regulatory duties under 21 C.F.R. §§ 803.50, 814.39, and 820.198 to disclose newly acquired safety information.

134. Abbott actively concealed or failed to disclose that:

- The SCS systems had undergone extensive, untested design and firmware changes;

- The FDA had approved the devices based only on similarity to legacy SCS systems—not on new clinical trial data;

- Known issues with therapy interruption, device shutdown during charging, and unintended stimulation had been internally reported, but not publicly disclosed;

- These issues resulted in multiple FDA recalls, including Class I recalls in 2023 and Class II recalls in 2024, matching the adverse experiences of Plaintiff and other patients.

135.    Abbott's concealment of these material facts was intentional, or made with reckless disregard for the truth, and was undertaken to encourage widespread implantation and minimize safety concerns in order to preserve market share.

136.    Plaintiff and his physician justifiably relied on Abbott's omission of material safety information when consenting to implantation of the SCS systems. Plaintiff was unaware— and had no way of knowing—that Abbott was concealing data and risks that materially affected the safety of these devices.

137.    Abbott's fraudulent concealment directly and proximately caused the Plaintiff's injuries, including his exposure to harmful device malfunctions, surgical intervention, and resulting physical and emotional harm. Had the concealed risks been disclosed, Plaintiff would not have consented to implantation. The concealment of safety-related defects amounted to active fraud in the context of patient trust and medical device implantation. For the avoidance of doubt, Plaintiff is not alleging fraud on the FDA.

### IX.     COUNT IX – VIOLATION OF the SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (Against Abbott Laboratories)

(South Carolina Unfair Trade Practices Act; ALTERNATIVELY, ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815CS 505/1 et seq.)

138.    Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

139.    Abbott Laboratories, through its consumer-oriented marketing, labeling, promotional efforts, and public communications, engaged in false, misleading, and deceptive acts and practices in connection with the promotion and sale of its spinal cord stimulator systems that were implanted in Plaintiff.

140.    These acts include:

- Falsely advertising the devices as safe, effective, and FDA-approved without disclosing that the approved form of the device was materially altered through over 230 PMA supplements;

- Failing to disclose known malfunctions, including painful shocks, device shutdowns, and therapy loss;

- Omitting material information regarding recalls, firmware instability, and clinical trial limitations;

- Misrepresenting the scope and meaning of FDA approval to patients and providers.

141.    Plaintiff was a foreseeable consumer of the device. Although he relied in part on his physician's advice, Abbott engaged in direct-to-consumer advertising and disseminated patient-facing marketing materials that contained false or misleading information.

30

142. Plaintiff and his physician reasonably relied on Abbott's omissions and misrepresentations when consenting to device implantation. Had the material facts been disclosed, Plaintiff would not have proceeded with implantation.

143. As a result of Abbott's statutory violations, Plaintiff suffered personal injury and economic loss and is entitled to recover all damages, equitable relief, and attorneys' fees available under state consumer protection laws.

## X.    COUNT X – NEGLIGENCE PER SE: UNAUTHORIZED  PRACTICE OF MEDICINE (Against Abbott Laboratories)

144. Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

145. South Carolina law prohibits the unauthorized practice of medicine by any individual or corporate entity not licensed in South Carolina. These prohibitions reflect a clear public policy interest in ensuring that only licensed professionals make medical decisions affecting patient care.

146. Abbott Laboratories is not licensed to practice medicine in South Carolina or any other state. Nevertheless, Abbott exercised functional control over the administration of Plaintiff's neuromodulation therapy by:

- Actively participating in the implantation of its SCS system in Plaintiff's body, intra operatively programing that SCS system, and programming the SCS system post-operatively;

- Pushing firmware updates and stimulation programming changes remotely after implantation;

- Designing and controlling preset therapy "profiles" that physicians could not override without manufacturer approval;

31

- Altering battery behavior, stimulation amplitude, and system responsiveness without physician direction or real-time medical oversight;

147. These actions constitute the unauthorized practice of medicine, as they involved making decisions about the nature, extent, and delivery of Plaintiff's therapy during and after implantation, without informed consent or involvement by a licensed provider.

148. Under South Carolina law, violation of a safety statute gives rise to negligence per se where the injured party is within the class the statute was intended to protect and the injury is of the type the statute was designed to prevent.

149. Plaintiff, as a patient undergoing neuromodulation therapy, is squarely within the protected class under South Carolina law. His injuries, caused by improper therapeutic manipulation without medical oversight, are the exact type the law is intended to prevent.

150. In the alternative, Illinois law also prohibits the unlicensed practice of medicine. See 225 ILCS 60/3, 60/49. Abbott's corporate conduct originating from its Illinois headquarters violated that statute by enabling automated therapy changes and device behavior modulation outside the physician-patient relationship.

151. As a direct and proximate result of Abbott's unauthorized and unlicensed manipulation of Plaintiff's therapy, Plaintiff suffered harm, including painful stimulation, surgical revision, and other physical and emotional injuries. This harm was exacerbated by Plaintiff's loss of therapeutic control, wherein Abbott, through remote firmware updates, preset programming, and device-level automation, functionally practiced medicine by dictating postimplant treatment decisions that should have remained within the licensed provider-patient relationship.

## XI.     COUNT XI – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (APA) (Against the U.S. Food and Drug Administration)

152.     Plaintiff incorporates by reference all allegations set forth above as though fully set forth herein.

153.     Plaintiff brings this Count pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702–706, seeking judicial review of final agency actions, omissions, and regulatory decisions by the United States Food and Drug Administration ("FDA") related to its handling of Abbott's spinal cord stimulator system approved under PMA P010032 and its associated supplements.

154.     The APA authorizes judicial review of agency action where a plaintiff suffers legal wrong due to agency conduct. See *Bennett v. Spear*, 520 U.S. 154, 162–64 (1997). A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

155.     As set forth above, the FDA approved the original spinal cord stimulator device under PMA P010032 in 2001. That approval relied not on device-specific clinical data, but on a conclusion that the device was "sufficiently similar" to existing devices, despite rejecting an advisory panel's recommendation to reclassify spinal cord stimulators to Class II. This allowed the FDA to preserve Class III preemption status while simultaneously lowering the evidentiary bar for approval below the "substantial equivalence" standard applied to 510(k) Class II devices.

156.     Since the original approval, the FDA has permitted Abbott to introduce more than 230 PMA supplements to P010032—many of which materially altered the design, functionality, safety, and risk profile of the device. These changes included:

- The introduction of new firmware-controlled stimulation algorithms;

- Bluetooth-enabled physician and patient controllers;

- Rechargeable battery platforms with new housing and architecture; and

- Waveform modifications never evaluated in human clinical trials.

157. These modifications, individually and cumulatively, triggered the need for a new PMA under 21 C.F.R. § 814.39(a), which requires new approval when changes significantly affect safety or effectiveness. The FDA's failure to require such a submission constitutes a final agency action that is arbitrary, capricious, and contrary to law.

158. In addition, the FDA failed to take enforcement action under 21 C.F.R. §§ 814.82 and 820.198 despite repeated adverse event signals, public Class I recalls, and internal knowledge of systemic defects in therapy delivery, firmware stability, and wireless programming.

159. The FDA's inaction has permitted Abbott to continue marketing spinal cord stimulator systems, including the Eon, Protégé, and Proclaim systems, that no longer resemble the device originally reviewed and approved, without requiring the clinical validation, public scrutiny, or labeling accuracy that the PMA process is intended to ensure.

160. These omissions and failures have directly harmed Plaintiff and similarly situated patients by depriving them and their physicians of accurate, current, and transparent information necessary for informed medical decision-making, and by preserving federal preemption for a device that no longer qualifies for it under the law.

161. The FDA's conduct violates its statutory duty under 21 U.S.C. §§ 360c and 360e to protect public health by ensuring that PMA devices undergo proper review and are not materially altered without appropriate oversight.

162. Abbott cannot invoke PMA preemption to shield its conduct while disregarding the obligations that give that status legal meaning. This Court must require the FDA to fulfill its statutory duties and restore integrity to the PMA process. If SCS manufacturers wish to benefit from PMA preemption, they must also bear the burden of compliance.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Declare that the FDA's failure to require a new PMA for Abbott's spinal cord stimulator systems referenced herein violated the APA and applicable statutory and regulatory duties;

b. Declare that the FDA's approval and ongoing allowance of materially altered devices under PMA P010032 without new safety review is arbitrary, capricious, and contrary to law;

c. Enter appropriate injunctive relief requiring the FDA to initiate enforcement proceedings or PMA reevaluation under 21 C.F.R. §§ 814.39 and 814.82;

d. Award attorneys' fees and costs associated with this APA action under applicable law;

e. Grant such other relief as the Court deems just and proper.

## XII.    COUNT XII – FRAUDULENT MISREPRESENTATION (Against Abbott Laboratories)
### (In the Alternative)

163.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

164.    If Abbott's Protégé and Proclaim devices were not significantly different systems from that originally approved by the FDA in 2001 under PMA P010032, and therefore its use of the PMA supplement process was appropriate, then Plaintiff pleads this allegation in the alternative.

165.    At all relevant times, Abbott and its predecessors, acting individually and through their agents, employees, and representatives, made material misrepresentations and omissions of fact regarding the safety and efficacy of its SCS systems, including the Protégé, and Proclaim systems implanted in Plaintiff.

166.    Defendant communicated directly with Plaintiff through sales representatives.

35

167. Defendant represented to Plaintiff, his healthcare providers, and the general public, through marketing materials, sales presentations, Instructions for Use (IFU), direct to patient communications, and other communications, that:

a. The Protégé and Proclaim systems were significantly different than older SCS systems;

b. The design of the Protégé and Proclaim systems were significantly better and more advanced than older SCS systems, including the Eon system that the Plaintiff had previously had implanted;

c. The Protégé and Proclaim systems were new and improved SCS systems; and

d. The devices' new capabilities reduced the risk of therapy failure and side effects compared to older systems.

168. These material representations were false. Defendant knew or should have known, through reasonable investigation, that its Protégé and Proclaims system were substantially the same as the system originally approved by the FDA in 2001 under PMA P010032.

169. Defendant made these material misrepresentations and omissions intentionally, willfully, recklessly, and with the intent to induce healthcare providers to recommend, and patients to consent to, implantation of its devices.

170. Plaintiff's healthcare providers justifiably relied on Abbott's representations in recommending the Protégé and Proclaim systems, and Plaintiff justifiably relied on the same representations in consenting to implantation and subsequent medical decisions.

171. Plaintiff had no reasonable means of independently discovering the falsity of Defendant's statements at the time of implantation, as Abbott had superior knowledge of the devices' design changes, clinical performance, and regulatory history, and actively concealed adverse information from physicians, patients, and regulators.

172. Plaintiff also had no reasonable means of independently discovering the falsity of Defendant's statements following implantation, as Abbott had superior knowledge of the devices' design changes, clinical performance, and regulatory history, and actively concealed adverse information from physicians, patients, and regulators.

173. Defendant's misrepresentations, including those made by sales representatives, before the implantation procedure caused Plaintiff to consent to the implantation of the Protégé and Proclaim SCS systems.

174. Plaintiff discovered the probable causal relationship between his injuries and Defendant's conduct only after experiencing continued device-related complications and reviewing public disclosures, adverse event reports, and litigation materials that contradicted Defendant's original representations.

175. As a direct and proximate result of Defendant's fraudulent misrepresentations and omissions, Plaintiff suffered significant injuries, including physical pain, emotional distress, medical expenses, lost income, diminished quality of life, and other consequential damages.

176. Plaintiff's fraud claims arise under South Carolina, and are not based solely on statements made to the FDA, but rather Defendant's intentional misstatements and concealments made to Plaintiff and his physicians to induce reliance.

177. **WHEREFORE,** Plaintiff demands judgment against Defendant Abbott for compensatory damages, attorneys' fees where allowed, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

## XIII.  COUNT XIII – NEGLIGENT MISREPRESENTATION (Against Abbott Laboratories) (In the Alternative)

178. Plaintiff realleges and incorporates by reference all preceding paragraphs of this

Complaint as though fully set forth herein.

179.    If Abbott's Protégé and Proclaim devices were not significantly different systems from that originally approved by the FDA in 2001 under PMA P010032, and therefore its use of the PMA supplement process was appropriate, then Plaintiff pleads this allegation in the alternative.

180.    At all relevant times, Defendant Abbott, acting individually and through its agents, employees, and representatives, owed a duty to exercise reasonable care in communicating truthful, accurate, and complete information about its spinal cord stimulator systems, including the Protégé and Proclaim systems.

181.    Defendant supplied false information in its promotional materials, sales presentations, Instructions for Use (IFU), labeling, and direct communications to healthcare providers and patients regarding the safety, efficacy, and design features, of the Protégé and Proclaim systems.

182.    Defendant communicated directly with Plaintiff through sales representatives.

183.    Defendant negligently misrepresented to Plaintiff, his healthcare providers, and the general public, through marketing materials, sales presentations, Instructions for Use (IFU), direct to patient communications, and other communications, that:

a.  The Protégé and Proclaim systems were significantly different than older SCS systems;

b.  The design of the Protégé and Proclaim systems were significantly better and more advanced than older SCS systems, including the Eon system that the Plaintiff had previously had implanted;

c.  The Protégé and Proclaim systems were new and improved SCS systems; and

d.  The devices' new capabilities reduced the risk of therapy failure and side effects compared to older systems.

184. Defendant made these representations without reasonable grounds for believing them to be true.

185. These material representations were false. Defendant knew or should have known, through reasonable investigation, that its Protégé and Proclaims system were substantially the same as the system originally approved by the FDA in 2001 under PMA P010032.

186. Plaintiff's healthcare providers reasonably relied on Defendant's representations in recommending implantation of the Protégé and Proclaim systems, and Plaintiff reasonably relied on the same representations in consenting to implantation.

187. Had Plaintiff and his healthcare providers been accurately and fully informed of the truth about the Protégé and Proclaim devices, they would not have elected to proceed with implantation or would have pursued alternative treatment options.

188. As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff suffered physical injuries, emotional distress, additional medical expenses, financial losses, and diminished quality of life.

189. Plaintiff's negligent misrepresentation claims arise under state common law. These claims are not premised solely on statements made to the FDA, but rather Defendant's misstatements made to Plaintiff and his physicians to induce reliance, and are not preempted under *Buckman* or *Riegel*.

190. **WHEREFORE**, Plaintiff demands judgment against Defendant Abbott for compensatory damages, attorneys' fees where permitted, costs of suit, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

## PUNITIVE DAMAGES ALLEGATIONS

191. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

192. Plaintiff specifically alleges that Defendant acted willfully, wantonly, and in reckless disregard for the rights and safety of others, including Plaintiff.

193. Abbott's manufacture, marketing, promotion, distribution and sale of a defective product and its failure to provide adequate warnings and instructions concerning the hazards it knew to exist was oppressive and done with conscious and reckless disregard for the rights and safety of others, including Plaintiff.

194. Abbott knowingly withheld and affirmatively misrepresented information to Plaintiff, the medical community, and the public at large, despite knowing its devices were likely to cause serious injury to users.

195. At all times relevant hereto, Abbott knew of the defective nature of its devices, and continued to design, manufacture, market, label, and sell the devices to maximize sales and profits at the expense of public health and safety.

196. Abbott misled regulators, the medical community and the public at large, including Plaintiff, by making false and misleading representations, and knowingly withholding information, about the safety of its devices.

197. As a direct and proximate result of Abbott's intentional, willful, wanton and reckless disregard for the safety of the public generally and of Plaintiff in particular, Plaintiff suffered the injuries described herein.

198. Plaintiff specifically requests punitive damages against Defendant Abbott to the maximum extent permitted by applicable state law on each count for which such damages

may be authorized.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant ABBOTT LABORATORIES, and, with respect to Count XI, against the United States Food and Drug Administration, and award the following relief:

a. Compensatory damages in an amount to be determined at trial for physical injury, pain and suffering, emotional distress, medical expenses, loss of enjoyment of life, and all other actual damages recoverable under applicable law;

b. Statutory damages and attorney's fees and costs pursuant to any applicable consumer protection statutes;

c. Punitive or exemplary damages, as allowed by law, based on Defendant Abbott's willful, malicious, and/or reckless disregard for the safety and rights of Plaintiff and the public;

d. Declaratory and injunctive relief against the FDA as set forth in Count XI, pursuant to 5 U.S.C. §§ 702–706;

e. Pre-judgment and post-judgment interest as provided by law;

f. The costs of this action; and

g. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 31, 2026         Respectfully submitted,


By: *s/Elizabeth Middleton Burke*
    Elizabeth Middleton Burke (Fed. I.D. 7466)
    Misty Black O'Neal (Fed. I.D. 12262)
    **ROGERS PATRICK WESTBROOK & BRICKMAN**
    1037 Chuck Dawley Blvd., Bldg. A
    Mount Pleasant, SC 29464

Ph:         (843) 727-6500
Fax:        (843) 216-6509
bburke@rpwb.com
moneal@rpwb.com

And

Ashleigh Raso (MN 0393353)
*Pro Hac Vice to be filed*
Nigh Goldenberg Raso & Vaughn
60th S. 6th, Floor 28
Minneapolis, MN 55402
Ph:         (202) 792-7927
araso@nighgoldenberg.com

ATTORNEYS FOR PLAINTIFF

42